Hoover Motor Express Company, Inc. (Successor by Merger to Indianapolis Forwarding Company) v. Commissioner.
Hoover Motor Express Co. v. Commissioner
Docket No. 4299-63.
United States Tax Court
T.C. Memo 1966-267; 1966 Tax Ct. Memo LEXIS 17; 25 T.C.M. (CCH) 1359; T.C.M. (RIA) 66267; December 13, 1966
*17 Net operating loss carryover deduction allowed in 1958 on account of net operating losses for the years 1953 to 1957, inclusive, of a corporation whose stock it acquired in 1958. Amounts paid out by acquired corporation to related company as commissions for soliciting freight hauling contracts, held, deductible as ordinary and necessary business expenses. Amounts paid out by acquired company to principal stockholder, and de facto head of the business, held, reasonable compensation for services rendered by him. Edward C. Rustigan and Neil G. Bluhm, for the petitioner. Helen A. Viney and Charles B. Wolfe, Jr., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: This proceeding involves a deficiency in petitioner's income tax for 1958 in the amount of $177,185.22. Some of the issues raised in the pleadings have been settled by agreement of the parties and some of the facts have been stipulated. The sole remaining question in issue is whether petitioner or Indianapolis Forwarding Co., (IFC) whose stock petitioner acquired in 1958, is entitled to a net operating carry-over loss deduction on account of operating losses sustained by *18 IFC in prior years. Findings of Fact The stipulated facts are included herein by this reference. Petitioner, Hoover Motor Express Company, Inc., is a Tennessee corporation with its principal office located at Nashville, Tennessee. The return for the year involved, 1958, was filed with the district director of internal revenue at Nashville. Petitioner is engaged in the motor freight transportation business. In 1958 it acquired all the stock of another motor freight company "IFC." A contract for the sale of all of IFC's stock to petitioner was entered into August 19, 1957, and was to become final 10 days after its approval by the Interstate Commerce Commission (ICC). On January 27, 1958, ICC authorized petitioner to acquire temporary managerial control of IFC and on September 29, 1958, gave its final approval of the sale. IFC's motor transportation business had been in operation under the same name either as a corporation or a partnership since 1938. It was organized by Harold E. Foreman, Jr., hereinafter called Foreman, who became its president and chief executive officer. Originally, Foreman and his wife, Jane W. Foreman, owned substantially all of IFC's stock. Sam M. Milkis *19 was employed as general manager. The business had a small beginning with only 2 trucks and 5 employees. In 1941 the corporation, also known as IFC, was dissolved and the business was conducted as a partnership owned by the Foremans with Milkis serving as general manager until September 1944. At that time Foreman and Milkis decided to reorganize the business and separate its sales and freight handling departments. Under this plan a new corporation, IFC, was organized to do the hauling under the management of Milkis, and the Foremans continued to handle the sales; that is, the solicitation of freight handling contracts with the public. All of IFC's stock was issued to Milkis and his associates. The Foremans assigned to IFC all of the partnership's operating authorities issued by ICC and the various states in which it operated, the goodwill of the partnership, and other assets, for a consideration of $50,000, to be paid at the rate of 1 percent of gross revenue per month with minimum annual payments of $2,500. Milkis was left in full charge of operating the corporation. By separate contract between the parties the Foremans acquired the "exclusive" rights to solicit freight hauling *20 business for IFC and were to receive commissions of 10 percent of IFC's gross revenue until they had received the $50,000 purchase price for the assets transferred to IFC, and 11 percent thereafter. These agreements were all approved by ICC. The Foremans continued to operate the freight soliciting business as a partnership under the name of Foreman Sales Company, hereinafter called "Foreman Sales", with the same sales force. It was soon found that IFC needed more capital and Foreman's mother and others contributed $30,000 cash, in consideration for which they were issued shares of IFC's common and voting preferred stock. The new stockholders gave Foreman their voting proxies, placing him in control of the company. In 1945 Foreman entered into agreements with several other competitive motor freight companies under which Foreman Sales was to solicit freight for them as well as for IFC. Soon thereafter the Interstate Commerce Commission (ICC) notified Foreman that for Foreman Sales to solicit business for other carriers it would be required to obtain a freight brokerage license. To circumvent these requirements Foreman entered into an agreement with Joseph P. Buster, who held such *21 a license, whereby the salesmen then employed by Foreman Sales were to be transferred to Buster's employment, or payroll, but were to continue to solicit freight for IFC. At the same time there was a revision of the existing agreement between IFC and Foreman Sales whereby the agreement was divided into two parts, one an ordinary service contract between IFC and Foreman Sales in which the Foremans were to serve IFC in an advisory capacity only and the other a freight solicitation agreement between IFC and Buster in which Buster agreed to do the freight soliciting for IFC. As compensation under the new agreement IFC was to pay Buster commissions based on its gross revenues from all freight moving from the Chicago zone to all other points at the rate of 5.04 percent per month on the first $30,000 and 9 percent on the balance. These commissions were intended to provide Buster sufficient funds to pay the salesmen plus a small profit. In addition IFC was to pay Foreman Sales commissions of 6.96 percent on IFC's first $30,000 per month of gross revenues and 3 percent on the balance on all freight moving out of the Chicago zone and 3 percent of all other freight, plus 3 percent on freight *22 moving on all other lines. The commissions payable to Foreman Sales were intended as compensation to Foreman for his services in obtaining business for IFC and for his advisory services in the business. Except for those changes evidenced by the agreements referred to above, there was no substantial change in IFC's business operations. The principal changes under the agreements were the shifting of the sales force from Foreman Sales to Buster and the revised commission rates to be paid by IFC. Approval of the changes was given by ICC. Early in 1947, Foreman learned that the stock of another corporation, James L. Emerick, Inc., which held an ICC brokerage license could be purchased and on March 21, 1947, he purchased all of the stock of that company for $7,500. He then changed the corporate name of the company to Foreman Freight Brokerage Company, hereinafter called "Brokerage," and had the contract between IFC and Buster assigned to it. The salesmen employed by Buster on behalf of IFC were then transferred to Brokerage. Foreman then became president of Brokerage and John A. Sullivan was employed as general manager. These changes likewise were approved by ICC. The following amounts *23 of brokerage commissions were paid or accrued to Brokerage by IFC in the years 1953 to 1957, inclusive, and were deducted by IFC in its returns: 1953
$ 88,979.26
1954
164,792.86
1955
202,947.70
1956
203,317.47
1957
196,465.68
Brokerage reported income or losses for the years 1953 through 1957, inclusive as follows: 1953
$11,140.13
1954
(3,593.96) loss
1955
4,466.38
1956
13,241.14
1957
5,409.88
Brokerage employed 12 to 14 full-time and 15 to 20 part-time salesmen. It paid out to its salesmen approximately 80 percent of the commissions which it received from IFC and about 65 percent of its commissions from other business. The following amounts were paid to four of its full-time salesmen by Brokerage over the 1953-1957 period: Rodocker
O'Connor
Ericksen
McMaster
1953
$33,714.36
$18,456.73
$16,474.52
$12,153.69
1954
25,591.53
16,258.23
17,979.31
12,790.49
1955
27,874.12
17,108.48
22,003.46
19,199.45
1956
29,037.54
17,980.12
21,999.72
19,932.95
1957
30,758.12
14,432.58
21,174.23
19,446.21
Brokerage and its salesmen were concerned chiefly with soliciting freight for IFC but they *24 also solicited business for other motor freight carriers. Sullivan had exclusive charge of all business dealings with other carriers. The commission rates charged them were generally higher than those charged IFC. In the latter part of 1947 Milkis withdrew from IFC and he and his associates sold their stock in the company to Foreman Sales and Foreman's brother-in-law, John Wineman. Robert Oppenheimer, another employee and stockholder of IFC, then became its president. On April 30, 1951, the agreement between IFC and Foreman Sales, in existence since January 1, 1946, as amended January 1, 1950, was cancelled and a new agreement was entered into under which Foreman Sales was to render "advice and opinions" to IFC concerning the conduct of its business, and as compensation for such services was to receive 2 1/4 percent of IFC's gross revenue derived from all freight moving over its lines. The agreement provided in part as follows: 9. In consideration of the services rendered and to be rendered hereunder by FOREMAN, INDIANAPOLIS agrees to pay FOREMAN, by monthly remittances, the following sums: (a) 2 1/4% of INDIANAPOLIS' gross revenues derived from all freight moving over the *25 lines of INDIANAPOLIS. (b) In addition to any amount or amounts payable under (a) above, an amount equal to 1/4 of 1% of the gross revenue for each quarter annual period, commencing April 1, 1951, if the net earnings for such quarter exceed $15,000.00, 1/2 of 1% of the gross revenue for such quarter annual period if the net earnings for such quarter exceed $22,500.00, and 3/4 of 1% of the gross revenue for such quarter annual period if the net earnings for such quarter exceed $30,000.00. All such net earnings shall be computed before any provision for federal income taxes and before making any deduction for the aforesaid amounts payable under this sub-paragraph (b). Gross revenue shall be as hereinbefore defined and all payments under this subsection (b) shall be made promptly after the end of each quarter annual period. 10. In the event FOREMAN [the Foremans] remove their residence away from Chicago or its suburbs, then upon such removal INDIANAPOLIS [IFC] shall, during the lives of FOREMAN or either of them, and during the time that they reside away from Chicago, pay them, or the survivor of them, a sum equal to one (1) per cent of the gross revenues as hereinabove defined *26 and the provisions of the preceding paragraph hereof shall no longer be effective. Should FOREMAN move back to Chicago or its suburbs, then the provisions of the preceding paragraph numbered 9 shall be reinstated and payments shall be resumed by INDIANAPOLIS to FOREMAN in the amounts and in the manner set forth in such paragraph. In the event of the death of Harold E. Foreman, Jr. the provisions of paragraph numbered 9 shall no longer be effective but INDIANAPOLIS shall be obligated to pay Jane W. Foreman amounts equal to one (1) per cent of its gross revenue as herein defined for and during her life. In the event of the death of Jane W. Foreman, the provisions of paragraph numbered 9 shall remain in full force and effect for and during the life of Harold E. Foreman, Jr., unless he shall have moved his residence away from Chicago or its suburbs, in which event the provisions of this paragraph 10 shall be applicable. Upon the death of Harold E. Foreman, Jr., and Jane W. Foreman, this agreement becomes terminated. In 1953 Foreman entered into an oral agreement with Oppenheimer to increase Oppenheimer's compensation. The method of calculating such increase was to total the amount *27 of fees received by Foreman Sales from IFC pursuant to the agreement dated April 30, 1951, and the salary received by Oppenheimer from IFC. The difference between one-third of said total amount and the salary Oppenheimer received from IFC was to be paid by Foreman Sales to Oppenheimber. Oppenheimer's salary as president of IFC was $17,000 per annum. Under that agreement the following payments were made to Oppenheimer by IFC and Foreman Sales during the years 1953-1957, inclusive: IFC
Sales
Total
1953
$17,160
$ 7,542.43
$24,702.43
1954
17,490
8,319.18
25,809.18
1955
16,380
12,043.70
28,423.70
1956
16,120
12,009.51
28,129.51
During the 1953-1957 period IFC was the largest motor freight carrier operating within its territory. It had terminals at Chicago, Indianapolis, Louisville and Cincinnati. It operated 60 to 75 tractors and about 180 trailers. It handled over 1,000 freight bills and moved about two and one-half million pieces of freight daily. Its employees averaged about 250 to 300. As IFC's business grew its agreement with Foreman Sales was amended so as to reduce the percentage of commission payable to Foreman Sales. The rate of commissions *28 during most of the 1951-1957 period, under the April 30, 1951 agreement, as amended, was 2 1/4 percent on all freight moving on all IFC's lines. IFC and Foreman Sales both kept their accounts and filed their income tax returns on an accrual basis. The following amounts were paid or accrued to Foreman Sales by IFC under the April 30, 1951 agreement during the years 1953 to 1957, inclusive, and were deducted by IFC in its returns as "management supervision fees and solicitation expenses": 1953
$56,981.46
1954
59,289.23
1955
70,251.11
1956
70,347.18
1957
0
During 1952, IFC under Foreman's direction, issued debentures in the amount of $90,000, to raise additional capital needed in the business. The subscribers were Foreman's relatives or friends. Each subscriber was issued shares of common stock along with the debentures as follows: Common
Debentures
Stock
Face Value
of IFC
Henry Crown
$25,000.00
7.7 shares
Gardner Stern
10,000.00
2.3
Robert Crown
12,500.00
3.85
Lester Crown
12,500.00
3.85
G. A. Rodocker
5,000.00
1.54
Harold E. Foreman, Sr.
25,000.00
7.7
Harold Foreman
0
7.7
$90,000.00
34.64 shares
*29 In 1951 it was decided that IFC needed a large amount of new equipment and that its old equipment needed overhauling. To carry out this plan a new corporation, Highland Equipment Corporation, was formed to purchase and hold title to the equipment to be used by IFC, and lease the equipment back to IFC. Highland's corporate stock was issued 50 percent to IFC and 50 percent to the holders of IFC's debentures. Foreman Sales purchased 25,000 of the debentures and received 10 percent of the corporate stock. As a bonus, the debenture holders were also given stock of IFC. The following are lists of Highland's and IFC's stockholders for the years 1953-1957, inclusive: 1953
1954
1955
1956
1957
Common Stock of IFC
Harold Foreman
10.50
13.00
13.00
13.00
13.00
Foreman Sales
23.25
29.79
37.49
44.99
44.99
R. Oppenheimer
47.50
40.00
40.00
40.00
40.00
John Wineman
16.25
16.25
16.25
16.25
16.25
L. R. Stern
7.50
7.50
7.50
7.50
7.50
Studebaker Sales Co.
7.50
7.50
7.50
0
0
Gardner Stern
2.30
2.30
2.30
2.30
2.30
Henry Crown
7.70
7.70
7.70
7.70
7.70
Robert Crown
3.85
3.85
3.85
3.85
3.85
Lester Crown
3.85
3.85
3.85
3.85
3.85
G. A. Rodocker
1.54
0
0
0
0
Harold E. Foreman, Sr.
7.70
7.70
0
0
0
Clara Spiegel
1.40
1.40
1.40
1.40
1.40
Walter Gatzert
1.40
1.40
1.40
1.40
1.40
Edwin Eisendrath, Jr.
1.40
1.40
1.40
1.40
1.40
Grace Rosenfeld
2.80
2.80
2.80
2.80
2.80
Jonathan Loeb
1-1/6
1-1/6
1-1/6
1-1/6
1-1/6
Thomas Loeb
1-1/6
1-1/6
1-1/6
1-1/6
1-1/6
Timothy Loeb
1-1/6
1-1/6
1-1/6
1-1/6
1-1/6
Albert H. Loeb
1-1/6
1-1/6
1-1/6
1-1/6
1-1/6
A. M. Loeb
1-1/6
1-1/6
1-1/6
1-1/6
1-1/6
Henry Loeb
1-1/6
1-1/6
1-1/6
1-1/6
1-1/6
Irving Harris
2.80
2.80
2.80
2.80
2.80
Grant Pick
7.00
7.00
7.00
7.00
7.00
Harold Florsheim
1.40
1.40
1.40
1.40
1.40
Minerva Becker
5.00
5.00
5.00
5.00
5.00
M. Harris (Harold Foreman, nominee)
5.00
5.00
5.00
5.00
5.00
174.64
174.64
174.64
174.64
174.64
Preferred stock of IFC
Foreman Sales
37.5
87.5
87.5
162.5
162.5
Harold Foreman
0
25.0
25.0
25.0
25.0
Oppenheimer
50.0
0
0
0
0
John Wineman
37.5
37.5
37.5
37.5
37.5
Studebaker Sales Co.
75.0
75.0
75.0
0
0
L. R. Stern
75.0
75.0
75.0
75.0
75.0
Harold Foreman, Sr.
25.0
0
0
0
0
Total number of Preferred Shares
Outstanding
300.0
300.0
300.0
300.0
300.0
*30 Highland stock Indianapolis Forwarding Co.
500 shares
Foreman Sales Co.
100
Harold E. Foreman, Jr.
40
Alyn Loeb
50
J. Loeb
16 2/3
T. J. Loeb
16 2/3
Tim Loeb
16 2/3
G. Pick
100
Grace Rosenfeld
40
Clara Spiegel
20
W. Gatzert
20
I. Harris
40
H. Florsheim
20
E. Izendrath, Jr.
20
1,000 shares
Foreman served as president of Highland but received no compensation from that company. He handled the transaction between Highland and IFC and was responsible for the type of equipment purchased and the financing arrangements. IFC rented all of its tractors and trailers from Highland during the 1953-1956 periods. In its returns for those years it deducted for "rental of revenue equipment" the following amounts: 1953
$462,360.46
1954
507,765.52
1955
504,855.56
1956
536,610.37
Highland was never intended to be an income-producing company. It never realized any substantial amount of earnings or declared any dividends. In its returns for the years 1954-1958, inclusive, it reported small amounts of income for 1955 and losses for the other years as follows: 3/31/54
($3,221.34) loss
3/31/55
1,280.41
3/31/56
(494.77) loss
3/31/57
(937.83) loss
4/1/58-12/31/58
(316.42) loss
(6,455.78) loss
*31 Highland's stock was sold in 1958 and its stockholders got back only the original cost of their stock. At the time petitioner acquired the stock of IFC, it was operating as a motor freight carrier serving Cincinnati, Louisville, Birmingham, Atlanta, Knoxville, Memphis, St. Louis and numerous intermediate points. After its acquisition of IFC's stock, the contract between IFC and Foreman Sales was cancelled and new contracts were entered into between petitioner, IFC, and Brokerage. At the same time it was agreed that Foreman would continue to solicit business for petitioner so as to assure petitioner the retention of IFC's old customers. The agreements between petitioner, IFC, and Brokerage were terminated on October 15, 1958, and Brokerage and Foreman ceased soliciting business for petitioner. Brokerage, later in 1958, assigned its freight brokerage license to a new corporation, Freight Brokers, Inc., which continued the business of Brokerage with the same carriers and customers at the same rates. Foreman served as president of Brokerage as well as Highland but was not an officer or employee of IFC during the 1953-1957 period. He was a director of IFC during the years 1954-1958, inclusive. *32 The following table shows the commissions which IFC paid to Foreman Sales and Brokerage, the amounts which it claimed as deductions in its returns and the amounts allowed or disallowed by respondent: Deductions Claimed for
Amounts Paid or
Payable to:
1953
1954
1955
1956
1957
Foreman Sales
$ 56,981.46
$ 59,289.23
$ 70,251.11
$ 70,347.18
None
Brokerage
88,979.26
164,792.86
202,947.70
203,317.47
$196,465.68
Total
$145,960.72
$224,082.09
$273,198.81
$273,664.65
$196,465.68
Allowed
100,887.74
105,571.72
124,898.28
128,253.38
127,884.50
Disallowed
$ 45,072.98
$118,510.37
$148,300.53
$145,411.27
$ 68,581.18
As a percentage of its gross revenue, the commissions which IFC paid to both Foreman Sales and Brokerage, or Buster, over the 1945-1957 period were as follows: Commission Rates as a Percent
of Gross Revenue
Income or
Year
(Loss)
1945
10% and 11%
($20,300.22)
1946
9 3/4%
30,132.91
1947
9 3/4%
23,933.89
1948
9 3/4%
25,203.22
1949
9 3/4%
( 17,585.76)
1950
9 1/4%
( 8,876.49)
1951
9 1/4% (through April 30
and 7 1/2% there-
after)
( 39,444.28)
1952
7 1/2%
( 32,282.63)
1953
7 1/2%
( 24,903.91)
1954
7 1/8% (the rate was 7 1/2%
for a little over 1
month - through
February 5)
( 71,494.63)
1955
7 1/8%
( 46,798.85)
1956
7 1/8%
($48,965.60)
1957
6.84% (The rate was 6.84%
( 76,343.83)
for a little over
1 month through
February 5. The
actual rate was
4.59% since Fore-
man Sales re-
ceived no com-
missions for the
year.)
*33 The average commission rates which Brokerage charged IFC during the years 1953-1957, inclusive, were lower than those charged many other carriers which it served and were also lower than the comparable rates charged by many other brokers. The rate charged IFC was 7 percent of gross revenue until February 5, 1954, 6 1/2 percent thereafter until February 1957, and 6.175 percent thereafter through the balance of 1957. The average rates paid by other carriers in that area varied from 7.7 to 7.9 percent. The operation of a motor freight transportation business such as IFC was engaged in during the 1953-1957 period involved numerous and varied managerial problems. Decisions had to be made as to the rate policy, such as whether to meet competitive cuts or to protest to the ICC; the kind of services to be provided, such as whether to accept freight for overnight hauls and whether to accept less than truckload lots; the types and quantities of equipment to be purchased; the insurance for vehicles and their licensing in states where the licensing was difficult; the compensation to be paid to employees; and numerous others. The area in which IFC operated was a depressed area for motor freight *34 carriers during most of the 1950's. Rates were highly competitive and in some instances were unprofitably low. Several of IFC's competitors operated at losses and were either forced into bankruptcy or were acquired by or merged with other carriers. During this period Foreman spent considerable time trying to acquire additional operating rights and to extent IFC's territory, but was unsuccessful. Also during most of 1957 he was trying to find a purchaser for IFC. The sale of IFC stock to petitioner was agreed upon August 19, 1957. Foreman was in control of IFC's policies from the time the business was first organized until its sale to petitioner in 1958. Although he was not an officer or employee of IFC and was a director for only a portion of the period, he attended the directors' meetings and was generally recognized as the head of the business. He was chiefly concerned with the promotional and sales end of the business. Even after Foreman Sales was organized as a separate organization he continued to handle 35 percent of IFC's old accounts and to solicit new ones. As Foreman Sales' president he was in direct control of the company and held regular weekly meetings with its salesmen. *35 He received no compensation as president of Brokerage except for $2,000 paid to him by Brokerage in 1957. He had income from other sources, principally investments, and received rentals from three trailers which he leased to IFC at the current rate. He reported income of $5,200 in 1953 and $1,300 in 1954 from Rentways, Inc., a corporation to which he had sold a truck leasing business in 1952 under an agreement requiring him to help the business retain its old customers. The amounts reported in 1953 and 1954 were identified as "deferred compensation for services performed in 1952." He performed no services for Rentways, Inc., after that year. Prior to 1956 Foreman had his office on LaSalle Street in Chicago and IFC's office was located at its terminal on Halsted Street. In 1956 and 1957 Foreman's and IFC's offices were both located at IFC's main terminal on Taylor Street. Over the 1945-1957 period IFC reported net losses and net income as follows: Net Loss
Net Income
1945
$20,300.22
1946
$30,132.91
1947
23,933.89
1948
25,203.22
1949
17,585.76
1950
8,876.49
1951
39,444.28
1952
32,282.63
1953
24,903.91
1954
71,494.63
1955
46,798.85
1956
48,965.60
1957
76,343.83
*36 In its return for 1958 IFC reported taxable income of $240,530.29, before any net operating loss deduction. It claimed a total net operating loss carryover from the years 1953-1957, inclusive, of $268,506.82, wiping out its taxable income for 1958 and leaving a $27,976.53 operating loss to carry forward. In determining the deficiency herein respondent has disallowed the deduction of the $268,506.82 operating loss carryover. Opinion Petitioner contends that respondent erred in disallowing the deduction of any of the commissions paid to Foreman Sales and Brokerage in IFC in the years 1953-1957, inclusive, and in disallowing the net operating loss carryover deduction of $240,530.29 which IFC claimed in 1958. Actually, what respondent has done in his determination of the deficiency herein is to disallow all of the so-called commissions paid by IFC to Foreman Sales, as being either excessive compensation or distributions of profits, and the commissions paid to Brokerage in excess of 4 percent of IFC's gross revenue, which he has determined was a reasonable amount of such commissions. Ultimately, the question to be determined is whether the disputed amounts were ordinary and necessary *37 business expenses of IFC. The evidence shows, we think, that they were. As to the commissions paid to Brokerage for its services in procuring freight hauling contracts, the evidence is that the payment of such commissions was the common practice of the motor freight industry and that the commissions which IFC paid to Brokerage were on the average less than those paid by other carriers and less than those which Brokerage charged other carriers for like services. Respondent's determination that IFC's payments to Brokerage were excessive and constituted in part a distribution of its earnings by IFC is contrary to the evidence and is, we think, erroneous. As to the amounts paid to Foreman Sales, petitioner's contention is that they were in payment for Foreman's services as IFC's chief executive officer and were reasonable in amount for the services which he actually performed for the company. These services were vouched for in some detail by Foreman himself and the other witnesses who testified on his behalf. There is no question in our mind but that Foreman, at all times here material, was actively engaged in the conduct of IFC's business and that he directed its policies and *38 passed on all important questions arising in the operation of the business. Although he was never an elected officer or employee of the company, he was the de facto head of the business. Whether Foreman is regarded as the "chief executive officer" of IFC (as petitioner chooses to call him, over respondent's objections), is not important. He was in fact head of the business and at all times, or at least since 1945, was in control of its policies and personally handled many administrative matters. He devoted all his working time to the business of IFC and its related activities, and except for the $2,000 paid to him by Brokerage in 1957, he received no compensation for such services other than the amounts which IFC paid to Foreman Sales. Since the disputed payments were for services performed by Foreman for IFC, our question is whether they were reasonable compensation for the services performed. As we have said, we think the evidence shows that they were. In support of his argument that the payments to Foreman Sales were not for services performed by IFC by Foreman, respondent calls attention to the above-quoted provision contained in the agreement of April 30, 1951, between IFC and *39 Foreman Sales for the payment of 1 percent of commissions to Foreman or his wife in the event they should move their residence from Chicago or to his wife for life in the event of Foreman's death. The provision for the conditional payments to Foreman or his wife does not necessarily establish the character of such payments as other than compensation for services performed. The parties may have intended that Foreman or his wife would continue to perform some services for IFC after moving their residence from the Chicago area, or after the death of Foreman. Also, the conditional payments may have been intended as deferred compensation for the services performed by Foreman. Moreover, the facts are that these contingencies did not happen. Foreman continued to live in the Chicago area and to perform the services for which the payments were made. In any event we think the evidence shows that as a whole the payments to Foreman Sales were reasonable compensation for services performed and are deductible as ordinary and necessary business expenses. Decision will be entered under Rule 50.